Kevin G. Little, SBN 149818
Michelle L. Tostenrude, SBN 290121
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
E-Mail: kevin@kevinglittle.com

Attorneys for Plaintiffs Jose Villasenor, Claudia Rivera,
Ruthimay Jordan Frick, Vanidee Quinonez, and Denise Ramirez

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| JOSE VILLASENOR; CLAUDIA RIVERA; RUTHIMAY JORDAN FRICK; VANIDEE QUINONEZ; DENISE RAMIREZ, for themselves and others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE COUNTY OF TULARE; SHERIFF MIKE BOUDREAUX; ASST. SHERIFF JOE TORRES; FORMER ASST. SHERIFF MARK GIST; CAPT. HARALD LILES; LT. JESSE COX; LT. CORY JONES; LT. BUDDY HIRAYAMA; LT. JAVIER MARTINEZ; LT. MEGAN PINHEIRO; SGT. MARCO MARTINEZ; SGT. MICHAEL MARTINS; SGT. GILBERT RODRIGUEZ; SGT. SANTOS SALGADO; UNKNOWN LAW ENFORCEMENT OFFICERS; UNKNOWN COUNTY OFFICIALS,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>42 U.S.C. § 1983 - Retaliation – Public Employee<br>Cal. Labor Code § 1102.5 – Retaliation<br>Cal. Gov't Code § 12900, *et seq*. – Retaliation<br><br>JURY TRIAL DEMANDED |

TO THE HONORABLE COURT :

    Plaintiff Jose Villasenor ("Villasenor"), Claudia Rivera ("Rivera"), Ruthimay Jordan Frick

("Frick"), Vanidee Quinonez ("Quinonez"), and Denise Ramirez ("Ramirez"), through their

undersigned counsel and for themselves and others similarly situated, hereby state and allege as

KGL

1    follows based on their personal knowledge and on information and belief, seeking compensatory

2    and equitable relief as set forth on the grounds stated herein:

3    **INTRODUCTORY STATEMENT**

4    The Tulare County Sheriff's Office has a tremendous sexual discrimination problem within

5    its rank and file, particularly in its Detentions Division.  The Tulare County Sheriff's Office also

6    has a significant issue with retaliation against staff who lodge complaints about illegal activity.

7    The Tulare County Sheriff's Office employees must endure a highly and inappropriately

8    sexualized workplace, which has offended and negatively impacted all of the Plaintiffs, male and

9    female alike, as well as others similarly situated. For staff who object to the inappropriate

10   workplace conditions, which include running sexually explicit commentary, overt sexual

11   gestures, circulation of sexual materials, and uninvited sexual advances ranging from

12   inappropriate glares, to touching, to implicit and explicit requests for unwanted sexual activity,

13   their careers suffer. Objecting staff are passed over for preferable assignments and promotions,

14   given the most arduous and undesirable tasks, go unrecognized for their accomplishments, and

15   are generally denied the benefits of equal and fair employment.

16   Contrarily, for staff who willingly participate in, submit to, or at least feign tolerance with the

17   sexualized workplace environment, and particularly those who participate in inappropriate

18   Department activities outside or work or engage in sexual activity with their supervisors, they

19   receive preferential treatment, which can include shockingly rapid advancement and more

20   preferable assignments normally given to longer tenured personnel.

21   All of the named plaintiffs have spent most, or all, of their law enforcement careers in the

22   Tulare County Sheriff's Office's Detentions Division. All of them have complained about,

23   opposed, refused, resisted, or objected to sex discrimination and/or the prevailing sexualized

24   environment. Villasenor has also complained about issues of public concern, including but not

25   limited to the sexualized culture within the Tulare County Sheriff's Office.

26   All of the Plaintiffs were retaliated against for their protected activities, including in extreme

27   manners that remain ongoing to the present. Four, Villasenor, Rivera, Frick and Ramirez, are at

28

KGL

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF                                   2

1 | risk of losing their careers and have been damaged severely emotionally and financially. One,

2 | Quinonez, was driven out of law enforcement.

3 |     Because a law enforcement agency should serve as a positive example of fairness and

4 | nondiscrimination and anti-retaliation, Plaintiffs bring this suit requesting compensatory and

5 | equitable relief as stated herein.

6 | **JURISDICTION AND VENUE**

7 |    1.  This Court has subject matter jurisdiction over this federal civil rights action pursuant to

8 | 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction over the supplemental state claims

9 | alleged pursuant to 28 U.S.C. § 1367. Venue in this judicial district is proper pursuant to 28

10 | U.S.C. § 1391.

11 |    2.  Plaintiffs have fulfilled all prerequisites to filing suit, including by making timely

12 | complaints to the County of Tulare and the California Civil Rights Division, the denial or closure

13 | of which gave their to right to bring their state law claims asserted herein in this Court.

14 | **PARTIES**

15 |    3.  At all material times, Villasenor was and is a citizen of the United States and an adult

16 | resident of County of Tulare. As stated above, Villasenor has been a sworn peace officer

17 | employed by the Tulare County Sheriff's Office (TSCO) for 14 years.

18 |    4.  At all material times, Rivera was and is a citizen of the United States and an adult

19 | resident of the County of Fresno. As stated above, Rivera has been a sworn peace officer

20 | employed by the TCSO for seven years.

21 |    5.  At all material times, Frick was and is a citizen of the United States and an adult resident

22 | of the County of Tulare. As stated above, Frick has been a sworn peace officer with TCSO for 11

23 | years.

24 |    6.  At all material times, Quinonez was and is a citizen of the United States and an adult

25 | resident of the County of Tulare. As stated above, Quinonez was a sworn peace officer with

26 | TCSO for five years.

27 |

28 |



7.  At all material times, Ramirez was and is a citizen of the United States and an adult resident of the County of Tulare. As stated above, has been a sworn peace officer with TCSO for nine years.

8.  Defendant County of Tulare ("Tulare County") is and at all times was a public entity chartered under the laws of the State of California. Tulare County is primarily responsible for supervising and funding the TCSO, the agency with primary jurisdiction within the unincorporated portions of the County. Tulare County is being sued herein because the retaliatory and discriminatory actions alleged herein, many of which were made or ratified by the chief decisionmaker of the TCSO and therefore qualify as policy, custom or practice for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny. Tulare County is also sued under state law, both because it is liable as Plaintiffs' employer under the state laws invoked herein and also because it is vicariously liable for the acts and omissions of its public employees consistent with California Government Code § 815.2.

9.  Defendant Sheriff Mike Boudreaux ("Sheriff Boudreaux") is and at all times was the Sheriff of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Sheriff Boudreaux is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare County, as well as his status as the final decisionmaker and policymaker of TCSO under federal law.

10. Defendant Assistant Sheriff Joe Torres ("Asst. Sheriff Torres") is and at all times was an Assistant Sheriff of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Asst. Sheriff Torres is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare County.

11. Defendant Former Assistant Sheriff Mark Gist ("Former Asst. Sheriff Gist") is and at all times was an Assistant Sheriff of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Former Asst. Sheriff Gist is

KGL

sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare County.

12.  Defendant Captain Harald Liles ("Capt. Liles") is and at all times was a Captain of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Capt. Liles is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

13.  Defendant Captain Jesse Cox ("Capt. Cox") is and at all times was a Captain of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Capt. Cox is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

14. Defendant Captain Cory Jones ("Capt. Jones") is and at all times was a Captain of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Capt. Jones is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

15. Defendant Captain Buddy Hirayama ("Capt. Hirayama") is and at all times was a Captain of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Capt. Hirayama is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

16. Defendant Lieutenant Javier Martinez ("Lt. Martinez") is and at all times was a Lieutenant of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Lt. Martinez is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

17. Defendant Lieutenant Megan Pinheiro ("Lt. Pinheiro") is and at all times was a Lieutenant of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Lt. Pinhiero is sued in her personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

18.  Defendant Sgt. Marco Martinez ("Sgt. Martinez") is and at all times was a Sergeant of the TCSO, and in that capacity had decision making authority personnel decisions, including the

KGL

decisions impacting Plaintiffs. Sgt. Martinez is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

19. Defendant Sgt. Michael Martin ("Sgt. Martin") is and at all times was a Sergeant of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Sgt. Martin is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

20. Defendant Sgt. Gilbert Rodriguez ("Sgt. Rodriguez") is and at all times was a Sergeant of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Sgt. Rodriguez is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

21. Defendant Sgt. Santos Salgado ("Sgt. Salgado") is and at all times was a Sergeant of the TCSO, and in that capacity had decision making authority personnel decisions, including the decisions impacting Plaintiffs. Sgt. Salgado is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with Tulare.

22. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Unknown Law Enforcement Officers and therefore sue said defendants by such fictitious names. Along with the named individual defendants, each of the fictitious defendants is legally responsible and liable for the injuries and damages alleged herein. Plaintiffs will amend this complaint to allege the true names and capacities of these defendants when they are ascertained. These fictitious defendants are all sued in their personal capacities for acts performed under color of law and in the course and scope of their duties.

23. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Unknown County Officials and therefore sue said defendants by such fictitious names. Along with the named individual defendants, each of the fictitious defendants is legally responsible and liable for the injuries and damages alleged herein. Plaintiffs will amend this complaint to allege the true names and capacities of these defendants when they are ascertained. These fictitious defendants are all sued in their personal capacities for acts performed under color of law and in the course and scope of their duties.



## FACTUAL ALLEGATIONS

### A. Villasenor

24. Villasenor began working for Defendant Tulare County Sheriff's Office (TCSO) in June 2010. Initially assigned to the Patrol Division, he transferred to the Detentions Division in August 2010, where he steadily built a distinguished career. Over the next decade, Villasenor served on the Continuous Improvement Team from 2014 to 2019 and as a Detentions Detective beginning in April 2019. He also served as a Jail Training Officer, a member of the TCSO Emergency Response Team, Gang Unit, and Honor Guard. Villasenor made significant contributions to major investigations, including the Goshen Massacre investigation. Despite his exemplary record, Villasenor became the target of severe retaliation for raising concerns about misconduct, unsafe practices, and systemic favoritism within TCSO.

25. In January 2022, Villasenor observed Sergeant Michael Martins viewing an inappropriate photo of a female staff member during work hours. Villasenor promptly reported the incident to Sergeant Enrique Celaya. In February 2022, Villasenor witnessed Sergeant Anthony Alvarez sharing a sexually explicit video of another female staff member with Deputy David Berry. Villasenor likewise reported this additional misconduct to Sgt. Celaya, but TCSO leadership failed to address either complaint.

26. On May 13, 2022, Villasenor submitted a formal memorandum identifying unsafe staffing practices in high-risk gang units. The memo cited specific policy violations committed by Deputies Joseph Calderon and Noel Ramirez, which jeopardized safety. Instead of addressing these concerns, Villasenor was removed from his Detentions Detective position and reassigned to a lower correctional position at the Adult Pretrial Facility (APTF). Lieutenant Javier Martinez falsely documented that Villasenor had requested the transfer. Villasenor never requested reassignment from the position he worked hard to achieve and loved. He later learned that Martinez was upset because the memo "made him look bad."

27. After his reassignment, Villasenor was relegated to less significant and sporadic assignments. He became socially isolated, as colleagues avoided him to avoid collateral damage

KGL

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF                                      7

or targets themselves. Villasenor was excluded from meaningful opportunities, further undermining his career and morale.

28. Despite these retaliatory actions, Villasenor continued to report and complain about improprieties. From March to June 2023, Villasenor filed multiple complaints about unsafe practices, including mishandling fentanyl without proper personal protective equipment (PPE). During this time, Villasenor reapplied for his Detentions Detective position, but less-qualified individuals were selected instead. In April 2023, Lieutenant Cory Jones sent Villasenor an "Expectations" email, which was intimidating and created a hostile work environment. In August 2023, Villasenor also received a retaliatory low-performance appraisal inconsistent with his prior exemplary reviews.

29. On August 29, 2023, Detention Service Officer Patricia Ceballos disclosed to Villasenor allegations of inappropriate advances by Sheriff Mike Boudreaux. Villasenor reported these allegations to Assistant Sheriff Joe Torres during a meeting on September 26, 2023, which also addressed his low-performance appraisal. On October 3, 2023, Villasenor filed a complaint alleging the existence of a "Law Enforcement Gang" operating within TCSO.

30. On October 12, 2023, Captain Duane Cornett informed Villasenor in Lieutenant Camacho's office that he was being placed on administrative leave. Villasenor is informed and believes that Assistant Sheriff Torres, with the approval of Sheriff Boudreaux, initiated his leave. During his leave, Villasenor discovered that his IA investigation had been stalled for months, leaving critical allegations unresolved. Villasenor was isolated further, unable to file additional complaints after Lieutenant Jesse Cox issued a formal directive on February 9, 2024, prohibiting Villasenor from contacting Tulare County Personnel further.

31. Villasenor's administrative leave process was mishandled from the beginning. Captain Cornett jeopardized the integrity of the investigation by initiating interviews before the external investigator had the opportunity to gather information from key witnesses. Internal Affairs investigations led by Sergeant Jessica Zendejas further reflected retaliation. Sgt. Zendejas misrepresented facts regarding Villasenor's complaint about a video viewed by Sergeant Anthony Alvarez and Deputy David Berry, attempting to undermine Villasenor's credibility,

KGL

even though it was confirmed that such a video – depicting plaintiff Frick – existed and was being disseminated.

32. In October 2024, after being on leave for a year, Villasenor was ordered to return to active duty without any resolution of his complaints or the allegations against him. Villasenor was told he would be placed in a court security position at the Dinuba Courthouse, which would require him to essentially work in isolation with no chance to utilize his excellent investigative skills and experience. Furthermore, upon his return, Villasenor faced continued retaliation, including surveillance by Captain Harald Liles, who attended Villasenor's Taser training despite not being on the roster, and Assistant Sheriff Joe Torres, who followed him to a public location. The surveillance extended to Villasenor's personal life, including law enforcement vehicles patrolling his neighborhood and aerial monitoring by law enforcement aircraft. These retaliatory actions prompted Villasenor to file another personnel complaint, which remains unresolved.

33. Human Resources Director Lupe Garza oversaw Villasenor's complaints, but she did not act in good faith to make sure they were thoroughly investigated, and that good faith conclusions were reached. Instead, Villasenor's many complaints languished inconclusively during the time he was on leave and even to the present time. Garza's inaction further perpetuated the culture of retaliation and intimidation within TCSO.

34. As a direct result of TCSO's actions, Villasenor experienced career sabotage, including punitive reassignments, extended administrative leave, exclusion from career advancement opportunities, and continued harassment. None of Villasenor's complaints were investigated in good faith or to his knowledge concluded. The individuals responsible for the retaliation against Villasenor include Sheriff Mike Boudreaux, Lieutenant Jesse Cox, Captain Harald Liles, Assistant Sheriff Joe Torres, Lieutenant Javier Martinez, and other unknown law enforcement officers. Villasenor continues to endure the professional and emotional consequences of the hostile work environment created by TCSO and its leadership.

### B. Rivera

35. Rivera began her employment with the TCSO in March 2017 as a Sheriff Correctional Deputy. Despite her commitment, professionalism, and strong performance, Rivera faced

KGL

repeated harassment, discrimination, and retaliation throughout her tenure at TCSO. These issues escalated as she sought career advancement and reported systemic misconduct within the department.

36. Before her hiring, Rivera attended a union picnic in April 2016, where she met Sheriff Mike Boudreaux. During the event, Boudreaux exhibited concerning behavior, including repeatedly staring at her chest. Boudreaux encouraged Rivera to apply for an upcoming position. Shortly after, Boudreaux began texting Rivera updates about the hiring process. After joining TCSO, Boudreaux messaged Rivera on Instagram. Boudreaux's advances escalated following her split from her then-partner and during periods when she was single, including requests to meet privately at conferences and suggestions to stay in one-bedroom rentals during work trips.

37. From the outset of her employment, Rivera was assigned to Unit 1, one of the least desirable posts in the department, since it was handled by one deputy rather than the two the required duties justified, and this position was always staffed with females who were disfavored based on complaints or rejecting the advances of their colleagues, such as Rivera and Quinonez.

38. Despite completing the academy while recovering from childbirth, Rivera consistently excelled in her duties. In August 2021, Rivera became a Jail Training Officer (JTO), a position she held in addition to her regular responsibilities. However, her attempts to advance her career were repeatedly thwarted. In 2022, Rivera ranked fourth on the sergeant exam but was passed over for promotion in favor of less-qualified male candidates.

39. Around this same time, Boudreaux's advances became more persistent, including deleted text messages urging Rivera to meet for coffee and repeated requests for photos. Rivera attempted to deflect these advances but felt pressured due to Boudreaux's authority.

40. Rivera's workplace also became increasingly hostile due to the behavior of Sergeant Gil Rodriguez. In June 2021, during a costume party, Rodriguez made inappropriate comments about Rivera's body and touched her backside without her consent. Rivera reported this incident to Lieutenant Villarreal, but her complaint was dismissed. Rodriguez continued to create a hostile environment, including showing favoritism toward Deputy A. Saenz, with whom he engaged in openly inappropriate and flirtatious behavior.



41. On August 15, 2023, Rivera filed a harassment complaint against Rodriguez, citing his inappropriate conduct and the disparate treatment of Saenz. Shortly after filing this complaint, Rivera received a retaliatory low-performance appraisal, a marked departure from her historically strong evaluations. She was also denied a position in the Strategic Response Unit (SRU), a prestigious assignment that had never been held by a female deputy, despite her qualifications. Instead, less-experienced male deputies were selected.

42. In October 2023, Rivera was served with an Internal Affairs (IA) notice for alleged remarks against Deputy Saenz, two months after her initial complaint against Saenz and Rodriguez. The IA investigation against Rivera began as a direct response to her harassment complaint. This notice caused Rivera significant distress, as she believed the allegations were a baseless attempt to discredit her complaints and retaliate against her.

43. On June 2024, Rivera was issued a "Memorandum of Counseling" related to the IA, despite the lack of evidence substantiating the allegations. During this meeting, Rivera reminded Lieutenant Villarreal of the incident in 2021 where Sergeant Rodriguez touched her inappropriately, stating she had witnesses. On July 9, 2024, Rivera was interviewed at her home by Sergeant Jessica Zendejas and HR Employee Relations Specialist Alyssa Marie Alvarado regarding the 2021 incident with Rodriguez. Despite providing detailed information, Rivera was never advised of the status or outcome of this case.

44. The stress from the ongoing retaliation and harassment forced Rivera to take a second stress leave in mid-2024 to protect her mental health and avoid further retaliation. As a single parent, Rivera suffered immense financial and emotional strain, which ultimately resulted in the loss of her home. She remained off work due to her inability to trust the workplace environment and fear of continued retaliation.

45. Rivera's complaints were mishandled at multiple levels. Human Resources Director Lupe Garza failed to ensure a thorough and good-faith investigation into Rivera's complaints. The IA investigations overseen by Sergeant Zendejas were biased and improperly conducted, creating an appearance of retaliation.



46. Rivera has repeatedly been excluded from meaningful opportunities, marginalized in her assignments, and subjected to a toxic environment where inappropriate behavior by supervisors was routinely ignored or excused. Despite raising valid concerns about systemic misconduct, Rivera faced escalating retaliation, including unfair evaluations, fabricated allegations, and exclusion from career-advancing roles. Rivera continues to endure the professional and emotional consequences of the hostile work environment created by TCSO and its leadership.

47. The individuals responsible for the harassment and retaliation against Rivera include Sheriff Mike Boudreaux, Sergeant Gil Rodriguez, who were the moving forces behind her retaliation and disparate treatment, including her lack of advancement and IA complaint. Additionally, TCSO leadership, including Internal Affairs and HR, failed to adequately address Rivera's complaints, perpetuating a culture of discrimination and retaliation.

### C. Frick

48. Frick has been employed by TCSO since July 2013, rising from Detention Services Officer (DSO) to Correctional Deputy, Jail Training Officer (JTO), and Sergeant. Despite her qualifications and commitment, Frick has faced retaliation, harassment, and systemic sexism throughout her career.

49. Frick's complaints include pervasive workplace sexism and targeted retaliation. In 2022, she was demoted from Sergeant to Deputy following an Internal Affairs (IA) investigation alleging inappropriate language, despite widespread cursing among male colleagues that went unpunished. These investigations were spearheaded by individuals, Sgt. Marco Martinez, and Sgt. Michael Martins, who previously made inappropriate sexual advances toward her. Specifically, Sgt. Martinez kissed Frick without her consent upon learning of her promotion, and Sgt. Martins made highly inappropriate sexualized and unwelcome comments to her in front of colleagues prior to spearheading the IA against Frick. Frick had objected to and resisted these inappropriate sexual advances, only to be investigated and demoted soon thereafter, with her perpetrators being the moving forces.

50. In June 2023, Frick learned that a photo(s) or video(s) of a sexual nature depicting her had been widely circulated within the TCSO. This incident caused severe anxiety, leading to



1  stress leave in October 2023. The situation was exacerbated by the inaction of supervisors,

2  including Assistant Sheriff Mark Gist, who failed to investigate or address the circulation of the

3  photo(s) or video(s). Instead, Frick was retaliatorily investigated as being the potential source of

4  the photo(s) or video(s).

5      51. The individuals responsible for the misconduct and retaliation against Frick include

6  Former Assistant Sheriff Mark Gist, Sergeant Marco Martinez, Sergeant Michael Martins, and

7  Unknown Law Enforcement Officers. Frick currently remains on leave, dealing with the mental

8  health and financial repercussions of her workplace mistreatment.

9      ***D. Quinonez***

10     52. Quinonez worked with TCSO for over five years before being forced to resign in

11 December 2023 due to systemic discrimination, lack of accommodations, and a gender-based

12 hostile work environment.

13     53. Quinonez experienced significant hardships during and after her pregnancy in 2022. She

14 was forced to respond to a jail fight, leading to a miscarriage and surgery. Despite thereafter

15 providing medical documentation of her resultant medical limitations related to her subsequent

16 pregnancy, her supervisor, Sgt. Santos Salgado, refused to accommodate her. Instead, she was

17 subjected to verbal abuse, called "irresponsible" and "selfish," for seeking accommodations and

18 denied light-duty assignments for extended periods. This pattern continued when Quinonez

19 returned to work postpartum, where she struggled to balance her job with nursing

20 responsibilities, often forced to go without coverage to breast pump.

21     54. Quinonez also experienced systemic sexism, including the preferential treatment of

22 certain female deputies who engaged in relationships or flirtatious behavior with superiors.

23 Quinonez frequently worked alone in Unit 1, managing over 100 inmates, while male deputies

24 and preferred female deputies received more favorable assignments. Quinonez' requests for

25 alternative shifts and accommodations for childcare were ignored, forcing her to work long,

26 grueling hours, often with her significant other on the same shift despite her repeated request that

27 they work alternating shifts due to childcare responsibilities. Quinonez' lack of accommodation

28 was due to repeated denials by Lt. Megan Pinheiro and Lt. Cory Jones.



55. Facing continued denial of accommodations and financial strain after exhausting FMLA and the cost of childcare necessitated by her conflicting shifts, Quinonez was forced to resign in late 2023.

56. The individuals responsible for the misconduct and retaliation against Quinonez include Lt. Megan Pinheiro, Lt. Cory Jones, Sgt. Santos Salgado, and Unknown Law Enforcement Officers. Quinonez currently is not involved in law enforcement, a career she once admired and was proud to be a member of.

**E. *Ramirez***

57.  Ramirez began her career with TCSO in 2015 as a Correctional Deputy. Over the years, she has endured harassment, discriminatory practices, and retaliation, particularly surrounding her pregnancies and health-related challenges, significantly impacting her career and well-being. Ramirez frequently faced retaliation for requesting accommodations for her pregnancies and health issues. Supervisors dismissed her legitimate needs with hostile comments such as, "Hey, you signed up for this." Despite her qualifications to work in the physically less demanding transport unit, a unit that was short-staffed and needed additional personnel in any event, Ramirez was transferred out of that unit or denied placement in that unit, to her medical detriment.

58. During one pregnancy, Ramirez was required to pump in inadequate facilities, such as restrooms, and routinely faced delays in obtaining coverage to pump, which led to complications like mastitis. Despite providing a doctor's note for accommodations, she was assigned duties unsuitable for her medical condition, such as prolonged standing and responding to emergencies. These denials culminated in her transfer to less favorable positions under the guise of operational needs, such as her March 2024 transfer from transport to a jail post, despite transport being critically understaffed. This transfer was ordered, despite clear contraindications, by Lt. Buddy Hirayama and Lt. Cory Jones.

59. Ramirez also experienced systemic favoritism and sexism in promotions and assignments. Despite her qualifications and passing the sergeant exam, she was repeatedly overlooked for promotion in favor of less senior and less experienced deputies. These

promotions often appeared to favor individuals engaged in flirtations or relationships with supervisors. In one incident, a colleague, Deputy Huerta, threatened her by saying, "Watch what you say. I can get you out of here [the transportation unit] real quick."

60. Ramirez's health challenges intensified following the loss of a pregnancy after responding to a fight in 2022, which led to surgery and the removal of her left fallopian tube. Despite recovering and returning to work, she was given faulty equipment, such as a malfunctioning P320 firearm that discharged unexpectedly, nearly seriously injuring her. Ramirez's physical and mental health deteriorated further due to long shifts, running multiple units, and experiencing frequent anxiety attacks. The hostile environment extended to daily inappropriate comments from colleagues, including being labeled a "snitch" for defending herself or objecting to misconduct.

61. The individuals responsible for the misconduct and retaliation against Ramirez include Captain Buddy Hirayama, Lt. Cory Jones, and Unknown Law Enforcement Officers. In June 2024, Ramirez had to take medical leave from work and is currently struggling with financial hardship after exhausting FMLA and receiving no compensation from TCSO's disability system.

### **FIRST CAUSE OF ACTION**

(42 U.S.C. §1983: Retaliation – Public Employee)

(All Plaintiffs Against County of Tulare, All Individual Defendants and Unknown Law Enforcement Officers)

62. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

63. There was a substantial causal relationship between Plaintiffs' constitutionally protected activity and the adverse action taken against them by Defendants because Defendants' actions directly and expressly punished Plaintiffs for their constitutionally protected activity. Plaintiffs' First Amendment activity was based on matters of public concern and were not part of their job duties.

64. In response to Plaintiffs' legitimate complaints, the individual defendants collectively participated in proceedings that resulted in adverse actions against them on specious grounds. In this manner, the individual defendants – all high-ranking supervisors -- not only acted



1  individually but also developed and maintained policies and customs that violated Plaintiffs'

2  constitutional rights. The Defendants collectively ratified, endorsed, and abetted these retaliatory

3  decisions and actions, and the basis for them. The Defendants, individually and collectively,

4  knew of, ratified, and failed to stop, the imposition of these adverse personnel decisions against

5  Plaintiffs for exercising their First Amendment rights.

6      65. As a direct result of Plaintiffs' exercising their constitutional right to speak publicly—at

7  least in part as a citizen—publicly on matters of public concern, the individual defendants, and

8  each of them, retaliated against him, including, *inter alia*, collectively taking adverse

9  employment actions against him. Absent Plaintiffs' exercising their constitutionally protected

10 rights to speak, the Defendants would not have taken the adverse employment actions against

11 them set forth herein.

12     66. At all times mentioned herein, Plaintiffs' constitutionally protected activities were related

13 to matters of public concern and were not undertaken pursuant to their job duties. Indeed,

14 Plaintiffs' speech was on matters of widely debated public concern, i.e., gender discrimination,

15 inappropriate sexual conduct, misconduct by law enforcement, and safety issues.

16     67. By taking adverse employment actions against Plaintiffs that were motivated by their

17 constitutionally protected speech, the Defendants violated their rights under the First

18 Amendment to the United State Constitution. The actions taken against Plaintiffs by the

19 Defendants have been continuing in nature since at least 2022 and continuing to the present, with

20 the intention of impairing or ending his law enforcement career, simply because they spoke out

21 on important issues of public concern.

22     68. As alleged above, Plaintiffs' retaliatory adverse actions were approved and ratified by

23 Sheriff Boudreaux and other high-ranking policymakers of the TCSO. These decisions and

24 adverse personnel actions thus reflect official policy, custom and practice of the TCSO consistent

25 with *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and its progeny. These actions are

26 therefore attributable to Tulare County and were the moving force behind the above-alleged

27 constitutional violations.

28



69. Tulare County's official policy, custom, pattern and practice of retaliating against Plaintiffs for their speech on matters of public concern has a continued chilling effect upon their speech activities. The adverse employment actions were intended to, did, and would reasonably chill and deter Plaintiffs or similarly situated public employees from speaking publicly on matters of public concern, out of fear that they may be punished as public employees.

70. As a direct result of the Defendants' misconduct and unconstitutional actions, Plaintiffs have suffered significant damages in an amount subject to proof at trial,including substantial financial losses, and also psychological and emotional harms; reputational harms; lost promotional opportunities and additional related financial losses.

71. As a direct, foreseeable, and proximate result of the Defendants' acts and omissions, Plaintiffs have suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to their damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

72. In performing the acts herein alleged, the Defendants acted intentionally to injure Plaintiffs, namely, to adversely affect their employment, because of the content of their constitutionally protected speech on matters of public concern, which they engaged in as citizens.

73. The individual Defendants' conduct was oppressive, despicable, and performed with a willful, conscious, and reckless disregard of Plaintiffs' civil rights such that punitive or exemplary damages are warranted.

74. Plaintiffs additionally request an award of his reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

75. Plaintiffs also request any additional relief in law or equity to which they would be entitled by the interests of justice, including the purging of their personnel files and restoration to deserved positions. Equitable relief cannot be subject to dismissal based on qualified immunity. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).

## SECOND CLAIM

(Cal. Labor Code § 1102.5 - Retaliation)

(All Plaintiffs Against the County of Tulare)

76. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

77. Plaintiffs engaged in statutorily protected activity when they spoke out on and complained about actual or perceived illegalities, specifically a pattern of discrimination and favoritism both within the TCSO, sexual misconduct, police misconduct, and safety issues. Speaking out on some or all of these issues and making the observations, complaints and/or criticisms Plaintiffs did on the above-enumerated topics was activity that could not lawfully be the basis for an adverse employment action against them.

78. As a result of their statutorily protected activity, Plaintiffs were subjected to retaliatory adverse action by the Tulare County.

79. There was a substantial causal relationship between the statutorily protected activity and the adverse actions taken against Plaintiffs by Tulare County, because it directly and expressly punished them for their protected activity.

80. As a direct result of Plaintiffs' exercising their right to speak out and complain about these actual or perceived illegalities, the County of Tulare retaliated against them, including, *inter alia*, taking adverse employment actions – suspension and termination -- against them. Absent Plaintiffs' exercising their protected rights to speak out against actual or perceived illegalities, the County of Tulare would not have taken the adverse employment actions against him set forth herein.

81. By taking adverse employment actions against Plaintiffs that were motivated by their protected activity, the County of Tulare violated their rights against retaliation under Cal. Labor Code § 1102.5.  The actions taken against Plaintiffs by the County of Tulare have been continuing in nature since at least 2022 and continuing to the present, simply because they spoke out on important issues of actual or perceived illegality.

82. As a direct result of the County of Tulare's acts and omissions, Plaintiffs have suffered significant damages in an amount subject to proof at trial,including substantial financial losses, and also psychological and emotional harms; reputational harms; lost promotional opportunities



1  and associated lost wages and pension income; and lost future income from post-retirement

2  private-sector employment opportunities that otherwise be available to them.

3      83. As a direct, foreseeable, and proximate result of the County of Tulare's retaliatory acts,

4  Plaintiffs have suffered and continues to suffer mental and emotional distress, humiliation,

5  anxiety, embarrassment, and discomfort, to their damage, in an amount according to proof at the

6  time of trial, and expenses incurred for treatment of same.

7      84. In performing the acts herein alleged, the County of Tulare acted intentionally to injure

8  Plaintiffs, namely, to adversely affect their employment, because of the content of their protected

9  activity.

10      85. Plaintiffs requests an award of their reasonable attorney fees and costs pursuant to Cal.

11  Labor Code § 1102.5, subdivision (j).

12      86. Plaintiffs also request any additional relief in law or equity to which they would be

13  required by the interests of justice, including alternative equitable remedies of expunging their

14  personnel files and restoration to their rightful positions.

15  **THIRD CLAIM**

16  (Cal. Government Code § 12900, *et seq*. - Retaliation)

17  (All Plaintiffs Against the County of Tulare)

18      87. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

19      88. Plaintiffs engaged in statutorily protected activity when they spoke out on and

20  complained about actual or perceived gender discrimination, hostile sexual work environment,

21  and/or other discriminatory conduct that could reasonably have been believed to violate

22  California's Fair Employment and Housing Act (FEHA), Cal. Government Code § 12900, *et seq*.

23  Specifically, Cal. Gov't Code § 12940, Chapter 6 of FEHA, prohibits discrimination and

24  retaliation in the workplace, and Plaintiffs spoke out against a pattern of discrimination and

25  favoritism both within the TCSO. Speaking out on some or all of these issues and making the

26  observations, complaints and/or criticisms Plaintiffs did on the above-enumerated topics was

27  activity that could not lawfully be the basis for an adverse employment action against them.

28



89. Plaintiffs continued to complain about these issues after they became the subject of retaliation.

90. As a result of their FEHA protected activity, Plaintiffs were subjected to retaliatory adverse action by the County of Tulare.

91. There was a substantial causal relationship between the statutorily protected activity and the adverse action taken against Plaintiffs by the County of Tulare because it directly and expressly punished them for their protected activity.

92. As a direct result of Plaintiffs' exercising their right to speak out and complain about these actual or perceived illegalities, the COF retaliated against them, including, *inter alia*, taking adverse employment actions against them. Absent Plaintiffs' exercising their protected rights to speak out against actual or perceived illegalities, the County of Tulare would not have taken the adverse employment actions against them set forth herein.

93. By taking adverse employment actions against Plaintiffs that were motivated by their protected activity, the County of Tulare violated their rights against retaliation under FEHA. The retaliatory actions taken against Plaintiffs by the COF have been continuing in nature since at least 2022 and continuing to the present, simply because they spoke out on important issues of actual or perceived illegalities under FEHA.

94. As a direct result of the County of Tulare's acts and omissions, Plaintiffs have suffered significant damages in an amount subject to proof at trial,including substantial financial losses, and also psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that otherwise be available to them.

95. As a direct, foreseeable, and proximate result of the County of Tulare's retaliatory acts, Plaintiffs have suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to their damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

96. In performing the acts herein alleged, the County of Tulare acted intentionally to injure Plaintiffs, namely, to adversely affect their employment, because of the content of their FEHA protected activity.

97. Plaintiffs request an award of their reasonable attorney fees and costs pursuant to Cal. Gov't Code § 12965, subdivision (b).

98. Plaintiffs also request any additional relief in law or equity to which they would be required by the interests of justice, including alternative equitable remedies of expunging their personnel files and restoration to their rightful positions.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment.

Dated: November 18, 2024                    LAW OFFICE OF KEVIN G. LITTLE

_/s/ Kevin G. Little_
Kevin G. Little
Attorneys for Plaintiffs Jose Villasenor,
Claudia Rivera, Ruthimay Jordan Frick,
Vanidee Quinonez, and Denise Ramirez

KGL